KLAUDER–WELDON DYEING MACHINE CO. v. STEADWELL DYEING MACHINE CO. et al.

(Circuit Court of Appeals, Second Circuit. March 29, 1904.)

No. 124.

1. PATENTS—INFRINGEMENT—DYEING APPARATUS.
    The Weldon patent, No. 354,281, for a dyeing apparatus, though not for a pioneer invention, was not anticipated, and shows patentable invention. Claims 1, 2, 3, and 4 also *held* infringed.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This cause comes here upon appeal from a decree of the Circuit Court, Northern District of New York, holding United States letters patent 354,281, December 14, 1886, to Leonard Weldon, for dyeing apparatus to be valid, and its first four claims to be infringed by a machine manufactured by defendants. The opinion of the Circuit Court is reported 122 Fed. 640.

Frederick W. Cameron, for appellants.

F. P. Warfield, for appellee.

Before LACOMBE and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The specification states that the invention relates to the class of dyeing apparatus designed for dyeing textile fabrics, and in which a rotary wheel or cylinder is arranged in the dye vat to intermittently dip the articles to be dyed into the dye-liquor; and the invention consists in an improved construction and combination of the component parts of the dyeing apparatus, whereby its efficiency is materially improved. It will not be necessary to set forth all the details of the apparatus. The following excerpt from the specification and Fig. 3 sufficiently describe it:

Fig. 3.

"The cylinder, C, I form of two stout heads, b, b (not shown in this figure), * * * secured to a wooden roller, c, through which the shaft, d, of the cylinder is extended and to which it is fastened. Lengthwise the interior of the cylinder, C, are extended a series of buckets, L, L, which are secured at their ends to the inner sides of the heads, b, b. These buckets are formed either V-shaped, or of similar angular shape in cross-section, and are arranged adjacent to the periphery of the cylinder, and preferably in such positions as to make one side, e, of each bucket, form a longitudinal section of the exterior of the cylinder, said side of the bucket being solid, while the other side, e', is perforated or composed of slats placed short distances apart. From the inner edge of each bucket, L, toward the center of the cylinder is extended a slatted or perforated partition, n, and near the aforesaid edge of each bucket is hinged at one edge a gate, f, which has its free edge extended toward the back of the adjacent bucket.

"In operation * * * the fabric or articles to be dyed are thrown into the buckets, L, L, from the top of one side of the vat, and by the rotation of the cylinder, C, said articles are carried in the buckets through the dye-liquor in the vat, and are thus intermittently dipped or immersed therein. The angular or V-shape of the buckets causes the articles to be retained in the buckets after leaving the bath of dye-liquor without moving from the positions in which they were taken up until the buckets are elevated to a position past a vertical line over the axis of the cylinder, C, when the aforesaid articles fall by gravity out of the elevated bucket and onto the back of the perforated side of the subjacent bucket and partition, n, and during this fall the articles

to be dyed are turned over, so that in their succeeding passage through the dye-liquor and toward the top of the cylinder the dye-liquor penetrates the layers of fabric in the buckets in opposite direction from which it passed through the same during the previous revolution of the cylinder, and thus the fabric is dyed more uniformly throughout. Heretofore the buckets of the wheel or cylinder have been formed concave or rounded transversely, and this form of the buckets caused the articles in process of dyeing to be rolled over in the bucket, and thus become more or less entangled or knotted in a mass and dyed unevenly. This, it will be observed, is effectually obviated by the angular or V-shape of the bucket, L, L."

The claims relied on are:

"(1) In a dyeing apparatus the combination with the rotary wheel or cylinder, of buckets formed angular in cross-section, as and for the purpose specified.

"(2) In a dyeing apparatus, the combination, with the rotary wheel or cylinder, of buckets in said cylinder adjacent to the periphery thereof, and of angular form in cross-section, substantially as shown and set forth.

"(3) In a dyeing apparatus, the combination, with the rotary wheel or cylinder, of buckets of angular form in cross-section and adjacent to the periphery thereof, and perforated partitions extending from the inner edge of the buckets toward the center of the wheel or cylinder, substantially as described and shown.

"(4) In a dyeing apparatus, the combination with the rotary cylinder, of buckets of V-shape in cross-section, and having one side solid and the other side perforated, and the solid side thereof constituting a longitudinal section of the exterior of the cylinder substantially as described and shown."

We are not satisfied from the evidence that the patentee was a pioneer in the art, nor that it is due solely to his improvement that the old method of stirring the fabric in the vat with poles has given place to the revolving cylinder. Nevertheless we concur with the judge who tried the cause at circuit in the conclusion that no anticipation has been shown, and that the combination of the patent exhibits patentable invention. The only important question in the case is whether defendants' structure infringes. That structure is shown in the following cut:

The specification very clearly indicates what is the distinctive feature of the combination covered by the first four claims. It is found in the buckets, "formed either V-shaped or of similar angular shape in cross-section." The precise degree of angularity is not stated, but it must be sufficient to enable the buckets to discharge the function which differentiates the operation of the machine of the patent from what the patentee asserts was the operation of earlier machines. The buckets are so arranged that, after the fabric is lifted above the dye-liquor in the vat, it is retained in the bucket till it reaches such a height that the action of gravity will cause it to move from the face of one bucket to the back of the next preceding one, in such a way that the portion of it which has just passed through the dye-liquor resting on the perforated or slatted side of the bucket will re-enter said liquor entirely exposed thereto. Moreover, this change of position, or "turning over," as the patent expresses it, is to be accomplished without allowing the fabric to be rolled over in the bucket, or entangled or knotted in a mass. Inspection of Fig. 3 of the patent shows a degree of angularity which will hold the fabric in the bucket until the bucket has moved "past a vertical line over the axis of the cylinder"—which is the phrase used in the patent; but the claims do not specify any particular degree of angularity, and, although the patent is not a pioneer one, they may fairly be construed to cover buckets whose angularity is such as to carry the fabric so close to the vertical that the change from face to back of bucket will be accomplished with sufficient quickness, and with so slight a movement within the bucket as to avoid the fabric's being rolled over with consequent knotting and entanglement. Looking now at the defendants' machine, it may fairly be held, as complainant's experts contend, that the portion of each compartment which lies in the acute angle formed between the perforated partition and the periphery of the cylinder is substantially a bucket, in which the fabric is held as it is pushed during the lower part of its revolution through the dye-liquor. This bucket has an angularity of shape. It possesses more of a V-shape than it would if the perforated copper partitions were arranged radially from the axis instead of being pitched backward 30° off the radius. Does the angularity thus produced between the periphery and the partition operate to dispose of the fabric during the upper part of its revolution substantially as the bucket of the patent does, and in substantially the same way? Looking at the drawing, it is manifest that the tendency to slip down, bunch, and be rolled over which would result from the use of radial partitions is largely reduced; but the impression was formed at the argument that the angle was not sufficiently acute to produce the operation described in the patent. It is apparent, however, that the quantity of fabric placed in a compartment and the speed of rotation of the machine are factors to be considered. Unfortunately, no working model is produced, and without one it is difficult to determine just what will happen during revolution of the cylinder. We can only consider the testimony on both sides, and dispose of the question according to the weight of evidence.

On this branch of the case the complainant called three witnesses. Goodlet, the expert, had never had any practical experience in the use of dyeing machines. He testified that in defendants' structure the

V-shape of the pockets or buckets causes the material to be retained in them after leaving the bath without substantially changing its position in the buckets until they are elevated to near a vertical line over the axis of the drum, when the fabric falls by gravity from said position upon the back of the preceding bucket. During this fall of the material said material is turned over so as to present a different side to the dye-liquor as the material again enters the bath. "I understand," he says, "that this change in the position of the material is effected without causing said material to roll over and become entangled or wadded." Asked, on cross-examination, if the goods to be dyed, if placed in the bucket formed by the acute angle, would be retained in the bucket until it reached a point past a vertical line over the axis, he replied: "Possibly not. I am not able to say positively, not having experimented with such a machine. But I think it would at least be retained in the pockets until they were in close approach to said vertical line, * * * and I think it would be turned over. It is possible it might slide to some extent on the partitions of the bucket." On redirect, comparing defendants' machine with prior patents in which there were radial partitions, he says that in these earlier machines the fabric would begin to move much quicker, and would roll over and over, so as to become knotted and matted, while in defendants' machines, with partitions 30° off the radius, "the goods are carried well up toward the vertical position before they begin to move, and then they move quickly inward and over at once onto the back of the preceding partition, so that any rolling action of the material which would tend to mat and knot is prevented. * * * The partitions would not reach a horizontal position until the inner ends thereof have reached a point 60° or less from the vertical. * * * It is the purpose of inclining the partition, in both complainant's and defendants' machine, broadly to prevent movement of the stock within the pocket until the rear partition of the pocket has moved a substantial distance from the horizontal toward the vertical line, in order that the movement of the stock, when such movement begins, may be such as to prevent knotting and matting, whether that movement is against the front partition or toward the center of the machine."

Complainant's next witness, Whitely, was a boss dyer; a practical man, who had used both machines. He testified that the incline of the lower wall of complainant's bucket serves to keep the stock from rolling into a ball, which would mat and full, and keeps the stock in good condition. It holds the stock from falling until it has passed the top of center. Of the defendants' machine he says it "operates in the same way [as complainant's], and the incline tends to serve to keep the stock in good shape for processes to follow. * * * It would keep the stock from rolling around and matting and fulling." How it operates to do so he does not particularize.

Complainant's next witness—Sjostrom—was a practical dyer, who had used complainant's machine. Describing its advantages, he said that the incline holds the goods in position until the pocket obtains almost its vertical, "when they are gradually and slowly slid or let drop into the dye-liquor again, thereby keeping the wool free from matting and the garments from rolling up. * * * By the wool or

garments falling out of the pocket after it has crossed the vertical, instead of sliding or falling towards the center of the machine, it drops or falls out near the periphery of the cylinder, thereby causing wool or garments the chance of the tendency to spread and open out," which he considers an important advantage. He never saw one of defendants' machines in operation, but, examining the drawing, testified that, in his opinion, its operation would be the same as that of complainant's. On cross-examination he said that the pockets in complainant's machine hold all that is placed in them till the contents are slid or dropped out, and admitted that, if the defendants' pocket or compartment was filled, "it will remain so; it [the stock] doesn't move at all, [except for] a setting or sliding movement toward the centre of the machine."

The defendants' expert Curtis testified that he had carefully examined and witnessed the operation of one of defendants' machines. He says: "A quantity of stock [how much he does not state] is inserted in a chamber or compartment, * * * and as the drum is slowly rotated the stock slides successively inwardly along one of said partitions until it engages the hub cylinder, along the surface of the hub cylinder until it engages the partition on the opposite side of the chamber, outwardly along the last-mentioned partition until it engages the peripheral wall of the cylinder, along which it slides until it again engages the first-mentioned partition. This movement of the stock is repeated with each rotary movement of the cylinder. * * * The stock has no falling movement, and no other movement except a slight rotary movement, due to the fractional retardation of that side of the wedge-shaped mass of stock which is in contact with the wall of its inclosing chamber." He further testified that the machine he observed was provided with a reversing gear, and was operated first in one direction and then in the opposite direction, and that, in whichever direction it was rotated, "the stock had moved inwardly, along its supporting partition, sufficiently to be out of contact with the periphery of the cylinder by the time the partition had assumed a position downwardly and inwardly at an angle of about 30° to the horizontal." He said that he was unable to distinguish any difference whatever in the movement of the stock within its chamber, due to the inclination of the partitions. From this statement it may be inferred that his observations were conducted when the cylinder was revolving very slowly.

The defendants also called a practical dyer, who was familiar with the operation of both machines. His first description thereof is not clearly expressed. Apparently some words have been omitted either in taking down or in transcription. Further on he states that there is no practical advantage in making the partitions at an angle to the radius; that when the pocket of defendants' machine rises above the water, and reaches a point where the partition leaves the horizontal, the liquor and stock begin to slide towards the center; and that, "as he should judge," when about eight or ten inches above the horizontal, the stock has slid away from the periphery. This witness testified that in operating defendants' machine the compartments are filled with dry stock, which, when wet, occupies about three-quarters of the space.

All this is not especially helpful. On the whole, we have reached the conclusion, as did the Circuit Court, that by reason of the angularity or

the inclination of the partitions the latter become shelves, which, when the machine is operated at a proper rate of speed, will elevate the goods to be dyed so far above the dye-liquor, without substantially changing their position, that within the short distance left to be traversed before the partition begins to descend the position of the goods is shifted from one partition to another, so as to present a different surface to the dye-liquor, with sufficient quickness to avoid the bunching, matting, and knotting which the patentee sought to prevent.

The decree is affirmed, with costs.